UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

REBECCA S. SERDANS,                               :
                                                  :
                              Plaintiff,          :
                                                  :         **MEMORANDUM**
              -against-                            :         **OPINION & ORDER**
                                                  :
THE PRESBYTERIAN HOSPITAL IN THE                  :         09-cv-1304 (PGG)
CITY OF NEW YORK,                                 :
                                                  :
                              Defendant.          :

------------------------------------------------------------x

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Rebecca S. Serdans alleges that Defendant The Presbyterian Hospital in the City of New York ("the Hospital") discriminated against her in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law ("NYSHRL"), Executive Law § 296 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 et seq. The Complaint alleges that Defendant discriminated against her because of her alleged disability – a neurological disorder called dystonia[1] – and then retaliated against her after she sought a reasonable accommodation.[2]

        Defendant has moved for summary judgment, and also moved to strike portions of Plaintiff's opposition. For the reasons stated below, Defendant's motion for summary judgment will be granted and Defendant's motion to strike will be denied as moot.

---

[1] Dystonia is a condition characterized by "dyskinetic movements due to disordered tonicity of muscle." Dorland's Illustrated Medical Dictionary, 31st ed. Dystonia causes parts of the body to involuntarily distort and twist, leading to gait difficulties and other symptoms.
[2] The Complaint also sets forth a hostile work environment claim, but Plaintiff withdrew this claim in her opposition brief. (Pltf. Opp. Sum. J. Br. 1)

## BACKGROUND

Plaintiff is a registered nurse ("RN") qualified to work in an intensive care unit ("ICU").  (Def. R. 56.1 Stmt. ¶ 11)[3]  The Hospital operates a variety of specialized care units, including a Cardiac Care Unit ("CCU"), a Cardio-Thoracic Intensive Care Unit ("CTICU"), a Medical Intensive Care Unit ("MICU"), and a Surgical Intensive Care Unit ("SICU").  (Id.)  For most of the period between August 1998 and November 2007, Plaintiff worked as a per diem RN for the Hospital.  (Id. ¶ 10; Pltf. Dep. 12)  Between November 2004 and January 2006, however, Plaintiff's status was that of a part-time nurse at the Hospital.  (Def. R. 56.1 Stmt. ¶¶ 19, 27; Pltf. Dep. 12)

Per diem RNs are paid a salary but do not receive medical benefits.  (Def. R. 56.1 Stmt. ¶ 12)  Their work schedule is determined as follows:  the RN provides her or his availability to the Hospital's nursing office, and the nursing office then offers assignments based on the per diem RN's stated availability and the Hospital's staffing needs.  (Id. ¶ 13)

Part-time RNs working at the Hospital must make a commitment to work a scheduled number of hours each week, and receive a salary and medical benefits pursuant to a collective bargaining agreement entered into between the New York State Nurses Association and the Hospital.  (Id. ¶ 21)

---

[3]  To the extent that this Court relies on facts drawn from Defendant's Local Rule 56.1 Statement, it has done so because Plaintiff has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where Plaintiff disagrees with Defendant's characterizations of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

On or about November 22, 2004, Plaintiff requested that Defendant change her employment status from per diem to part-time, making her eligible to receive medical benefits. Plaintiff requested the change because she was about to undergo a medical procedure called Deep Brain Simulation ("DBS") in order to alleviate her symptoms from dystonia. (Id. ¶ 19) Defendant granted Plaintiff's request and changed her status to that of a part-time RN. (Id. ¶ 20)

On or about December 30, 2004, Plaintiff underwent the DBS procedure. (Id. ¶ 22) Following her surgery, Plaintiff's doctors authorized her return to work without any restrictions.[4] (Pltf. Dep. at 91-92; Topel Aff., Ex. 8) A March 4, 2005 "To Whom It May Concern" letter from Dr. Michael G. Kaplitt, Plaintiff's neurosurgeon, described the DBS procedure and made certain recommendations concerning Plaintiff's work assignments at the Hospital:

> My patient, Rebecca (Beka) Serdans, RN, underwent the procedure Deep Brain Stimulation to control her symptoms related to dystonia on Dec. 30, 2004. Deep brain stimulation (DBS) uses surgically implanted medical devices, similar to cardiac pacemakers, to deliver electrical stimulation to precisely targeted areas within one or both sides of the brain. Stimulation of these areas blocks the signals that cause the disabling symptoms of primary dystonia. She has just returned to fulfill her academic studies as well as her employment obligations (14 February 2005). Although Beka is recovering nicely with the frequent programming sessions (every 2 to 4 weeks) that must be undertaken for the next twelve months[, s]he is at risk for device and lead migration and breakage, electromagnetic interference, dyskinesias, speech disorders and other neurological side effects. Thus, it is in her best interests that she work in the ICU setting and avoid any floor work including step-down units until further notice from me. Many patients see minimal benefit until 3 months out, and it's becoming increasingly clear that there are subtle, long-term improvements continuing out to 6 months to 1 year or possibly more. At this time she is less than 2 months out of the procedure and, therefore, has not yet reached the full benefits of the procedure.

---

[4] Although Plaintiff twice stated at her deposition that her doctor put no restrictions on where she could work, she asserted that her return to work was "with the knowledge that MRI exposure was a no-no." (Pltf. Dep. 91-92)

> It is my recommendation that Beka work primarily in the controlled
> setting of an ICU only so that I can continue to monitor and readjust
> her DBS settings as needed on a regular basis until she has gained full
> benefits of the procedure.

(Topel Aff., Ex. 8)

On December 20, 2005, Plaintiff requested that Defendant "change her employment status from part-time RN back to a per diem critical care float RN." (Def. R. 56.1 Stmt. ¶ 25) "Float RNs" work in different ICUs on an as-needed basis. (Id. ¶ 26) Defendant granted Plaintiff's request, and converted her employment status to that of a per diem RN effective January 16, 2006. (Id. ¶ 27) The return to per diem status offered Plaintiff higher hourly compensation but no medical benefits. (Id. ¶ 28)

In a January 12, 2006 email, Kristin Strybing, a Nurse Practitioner affiliated with Dr. Kaplitt, informed Defendant that Plaintiff could return to work on January 13, 2006:

> Ms. Rebecca Serdans is cleared to return to work on 1/13/06. Her dystonic
> symptoms persist but do not preclude her fulfilling her duties as an ICU nurse.
> The only limitation she has is she cannot be exposed to MRI [magnetic resonance
> imaging], as this can cause complications with her deep brain stimulating
> system. . . .

(Topel Aff., Ex. 11; Def. R. 56.1. Stmt. ¶ 29)

On February 8, 2006, Dr. Kaplitt wrote another "To Whom It May Concern" letter concerning Plaintiff. The February 8, 2006 letter quotes Kaplitt's March 5, 2005 letter in full, but adds the following postscript concerning Plaintiff's condition:

> Since the time of [my March 5, 2005] letter, it is my understanding
> that a new MRI machine has been installed within one of the units in
> which she works (I believe it is the 8th floor ICU). While Beka has
> had significant improvement from surgery, at times she has developed
> some resistance to therapy and has had some other issues which have
> required ongoing programming and therapy. Several weeks ago she
> improved substantially following an adjustment, but after an evening
> working in the unit near this MRI machine, her symptoms significantly
> worsened again. Use of her personal screener suggested that the

> battery may have been turned off.  I cannot emphasize how important
> it is for Beka to remain distant from MRI machines and any other
> sources of powerful electromagnetic fields, since this can both turn her
> battery off as well as change the settings.

(Topel Aff., Ex. 12)

There are no MRI machines in most of the Hospital's intensive care units, including the CTICU, SICU, MICU, and CCU.  (Def. R. 56.1 Stmt. ¶ 35)

On January 29, 2007, Plaintiff asked to return to part-time RN status as a float nurse in the CTICU, SICU, and CCU in order to receive medical benefits.  (Id. ¶ 31).  On February 7, 2007, Catherine Halliday, the Hospital's Director for Cardiac Care, informed Plaintiff that the Hospital did not have any positions available in the float pool, but offered – as an accommodation to Plaintiff – to convert a full-time position in the CCU to part-time.  (Topel Aff., Ex. 14)  Plaintiff rejected the offer, stating that while she would work in the CCU on a float basis, she could not "work on a permanent basis in the CCU due to the fact that they use magnets to alter pacemaker settings."  (Id., Ex. 15) (emphasis in original).  The Hospital thereafter continued to offer Plaintiff per diem assignments allowing her to float between the various ICUs. (Def. R. 56.1 Stmt. ¶ 43)

In July 2007, Plaintiff asked Stacie Williams, the Hospital's Director of Labor and Employee Relations, to assign her to work only in the CTICU, because that unit had "less magnets."  (Pltf. R. 56.1 Counter-Stmt. ¶ 44)  On July 25, 2007, Williams responded to Plaintiff's request:

> . . . . Since we do not have part-time float positions in the Hospital, we offered
> you a part-time RN position in the CCU in an effort to meet your request for part-
> time employment.  However, you declined the offer, citing that you are unable to
> work solely in CCU even though you currently float to CCU.
>
> In an effort to understand the limitations you have identified and your current
> needs, we are asking that you meet with Leslie Knodratowicz in Occupational

Health Services (OHS).  Ms. Knodratowicz will review with you and your healthcare provider your current needs.

Once you have met with OHS, I will follow up with you and do what we can to assist you in addressing your concerns.

(Topel Aff., Ex. 17)

On August 3, 2007, Plaintiff responded to Williams' letter.  (Id. Ex. 18)  Plaintiff stated that she was "exhausted from 'fighting the system'" "when few understand . . . dystonia . . . how it impacts movement, how I have been able to deal with it and how DBS affects me both positively and negatively and why I suggested a [part time] float pool position be created."  (Id.) Stating that she would "speak [with her] healthcare provider and legal counsel before proceeding with a[n] OHS evaluation," Plaintiff noted that she had been "evaluated and cleared to work in ICU areas except for Neuro, which has an MR[I] on its premises."  (Id.)  Finally, Plaintiff stated that she had not "currently worked in CCU because CTICU has valued [her] the most and has required the most attention as a Unit.  They, the staff, also understand dystonia very well without any lengthy explanations."  (Id.) (emphasis in original).

On October 12, 2007, Dr. Kaplitt sent the following letter to Bart Minsky, the Hospital's Vice President for Human Resources, concerning Plaintiff's medical condition:

Thank you for the conversation earlier this week regarding my patient, Rebecca Serdans.  As you are aware, she is a nurse in the CTICU at your campus who suffers from a devastating neurological disorder called dystonia.  This is a neurological disorder characterized by abnormal muscular contractions and twisting motions and posturing of body parts.  This is a painful disease that can also make normal activities of daily living difficult for afflicted individuals.  Many patients have difficulty working due to the severity of their disorder. Ms. Serdans has for many years suffered from this disease, which is primarily localized in her neck and head, although there is some milder effect elsewhere in her body. . . . This can be treated non-surgically for a while, with botox injections for example, and Ms. Serdans responded to this well for some time.  As occurs with many patients, however, she became resistant to this therapy over time.  Therefore, nearly three

6

years ago she underwent implantation of bilateral deep brain stimulation (DBS) electrodes in her brain in an attempt to further treat this disorder.  This is a therapy that is available to medically-refractory patients and has a history of some very promising results in many patients.

Ms. Serdans had an outstanding result for approximately 6 months after surgery, then had some increased variability in her response. Nonetheless, she has generally maintained a good response since that time despite a return of some of her symptoms.  Recently, however, she has had far greater variability in her symptoms, with increasing severity at times.  In evaluating all of her activities, there does seem to be a correlation between her worsening symptoms with working one or two nights before in units which are foreign to her.  It is well known among practitioners of DBS that environment, particularly the electromagnetic fields in a given environment, can influence patient responses and adverse effects of DBS therapy.  Unfortunately, there is little data indicating specific parameters which can be measured, quantified and/or avoided to guarantee a good ongoing response. Essentially, this is a trial and error business and patients learn to avoid situations which adversely influence their therapy.  In this case, while I would wish to be able to provide guidance as to specific types of equipment or settings to be avoided, that is simply not possible.  The best that can be done is to anecdotally evaluate the situation and respond appropriately.  There are very few DBS patients in Ms. Serdans['] situation, who work in hospital ICU environments following surgery, so this makes generating specific guidelines even more difficult.

In my opinion, it is fairly miraculous that someone with Ms. Serdans['] condition, who has also undergone brain implantation of an electronic device, can continue to work in such a physically and emotionally demanding environment as the CTICU night shift.  Yet she appears to remain devoted to this job, and given her disease state and limitations, this should be applauded.  Given the vagaries of both this disease and the response to DBS surgery over the long term, I believe that any accommodation which is reasonably possible to ease her ability to continue in the job that she loves should be attempted. As a neurosurgeon on staff at NYPH Weill Cornell campus, I am certainly sympathetic with the difficulties of addressing the varied issues of the many employees at this institution.  While I cannot claim to understand the HR situation or non-medical issues surrounding her job, I do believe that she would do better in the long-term remaining in the CTICU without floating to other units, based upon my long experience with her post-operative state following shifts in these various environments.  Therefore, anything that could be done to

7

facilitate this within reason would be greatly appreciated.

(Id. Ex. 19)

On October 24, 2007, Plaintiff met with Williams and Robert Murphy, Plaintiff's

NYSNA union representative, to discuss Plaintiff's request to work exclusively in the CTICU as

a per diem RN.[5]  (Def. R. 56.1 Stmt. ¶ 51)  The Hospital and the NYSNA agreed to permit

Plaintiff to work as a per diem RN solely in the CTICU, subject to the Hospital's needs.  (Id. ¶

54)

Plaintiff contends that in the following weeks she was asked to work in units other

than the CTICU, including the MICU and the SICU.  (Pltf. R. 56.1. Counter-Stmt. ¶¶ 58, 59)

Plaintiff viewed these requests as violating her agreement with the Hospital, and she complained

to Williams in a November 12, 2007 email:

> Saturday [night] I went in to work as scheduled, yet was placed in the Medical
> ICU.  According to our agreement this is a violation.  According to the nursing
> supervisor on the day shift she "didn't know my new circumstances".  Nor had
> she received any sort of correspondence.  Due to my moral and ethical work
> standards I worked the 12 hours in the MICU recognizing their staffing issues. . . .
> I know the risks I was taking regarding my DBS settings which require
> reprogramming a second time, but I also recognize patient needs. . . .

(Topel Aff., Ex. 22)  Plaintiff closed her email by stating:  "If these circumstances regarding my

current situation cannot be clarified, my lawyer Norman Siegel, Esq. is quite happy to do so for

me."  (Id.)

Williams immediately contacted Hospital staff to remind them that Plaintiff was

only to be offered work in the CTICU.  (Def. R. 56.1 Stmt. ¶ 64)  Plaintiff contends that although

---

[5]  Although Plaintiff asked to be assigned solely to the CTICU, she asserted during her
deposition that electromagnetic interference ("EMI") is present throughout the hospital.  (Pltf.
Dep. 148)  Plaintiff further contends that MRI machines on adjacent floors interfered with her
DBS device.  (Pltf. R. 56.1 Stmt. ¶ 35).  According to Plaintiff, "any electronic equipment," from
cell phones and iPods to diagnostic machines in the hospital, could interfere with her DBS device
or shut it off.  (Pltf. Dep. 124)

November 10, 2007 was the only day she worked outside the CTICU after the October 24, 2007

agreement, Defendant asked her to work outside of the CTICU on other occasions.  (Pltf. R. 56.1

Stmt. ¶ 61; Pltf. Dep. 202)

       Plaintiff was assigned to, and worked in, the CTICU on November 19, 20, 23, and

December 4, 5, and 8, 2007.  (Def. R. 56.1 ¶ 68)  Her work in that unit then ended, for reasons

that the parties dispute.  Defendant argues that it never terminated Plaintiff's employment as a

per diem RN (Id. ¶ 81) and that timesheets it has submitted demonstrate that Plaintiff was offered

work in the CTICU on November 22 and 24, and December 10, 11, 12, and 24, 2007, but refused

the assignments.  (Stendor Decl., Ex. 2)  The proffered time sheets are not decipherable by this

Court.  Plaintiff testified that she repeatedly appeared at the Hospital's nursing office in

December and was told that no work was available in the CTICU.[6]  (Pltf. R. 56.1 Stmt. ¶¶ 70-71,

75)  She does admit to "self-cancelling" a CTICU assignment as late as January 24, 2008.[7]  (Id. ¶

70)

       In January 2008, Plaintiff was employed for three weeks as a per diem nurse at

Lenox Hill Hospital.  (Def. R. 56.1 ¶ 77)  It is undisputed that Plaintiff has not provided the

Hospital with dates of her availability to work, or otherwise requested work assignments, since

February 2008.  (Id. ¶ 75)  From March 2008 through at least August 11, 2009, the date of

Plaintiff's deposition, Plaintiff has worked as a full-time nurse at Beth Israel Hospital.  (Id. ¶¶

78-80)

---

[6]  At her deposition, Plaintiff was asked "Was your employment ever terminated by Presbyterian
Hospital?"  She answered, "No."  (Pltf. Dep. 18)  Plaintiff's counsel asserts that Plaintiff's theory
is that she was constructively discharged.  See Memorandum in Opposition to Defendant's
Motion to Strike, at 4.
[7]  This admission conflicts with Plaintiff's claim that "Defendant permanently removed Plaintiff
from the work schedule in early December 2007."  (Pltf. R. 56.1. Stmt. ¶¶ 75, 81)

On June 2, 2008, Plaintiff filed a charge of discrimination with the New York State Division of Human Rights and the Equal Employment Opportunity Commission ("EEOC").  (Id. ¶ 84.)  The EEOC issued Plaintiff a right to sue letter on January 26, 2009. (Topel Decl., Ex. 25)

## DISCUSSION

## I.   DEFENDANT'S MOTION TO STRIKE

Defendant has moved to strike an affidavit and certain exhibits that Plaintiff has submitted in opposition to Defendant's summary judgment motion, arguing that the affidavit contains hearsay, and that the exhibits were not produced during discovery.  With respect to Defendant's hearsay objections, it is well established that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  This Court has followed that rule in resolving Defendant's summary judgment motion.  Similarly, this Court has not considered – in resolving Defendant's summary judgment motion – materials that were not produced to defense counsel during discovery.  Accordingly, Defendant's motion to strike will be denied as moot.

## II.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Complaint asserts causes of action for (1) unlawful workplace discrimination due to Plaintiff's alleged disability, in violation of the ADA, the NYSHRL, and the NYCHRL; (2) unlawful retaliation against Plaintiff in violation of state and city law; and (3) aiding and abetting discrimination in violation of state and city law.  Defendant has moved for summary judgment on all claims.

As noted earlier, Plaintiff has withdrawn her hostile work environment claim. (Pltf. Opp. Sum. J. Br. 1)  Accordingly, to the extent that the Complaint pleads a hostile work environment claim, Defendant is entitled to summary judgment on that claim.

Plaintiff has not addressed Defendant's arguments that (1) to the extent that Plaintiff's ADA claims rely on events that took place prior to August, 7, 2007, they are time-barred; and (2) Plaintiff has not made out a claim for constructive discharge.  Accordingly, to the extent that the ADA claims in the Complaint rest on pre-August 7, 2007 conduct, and on a theory of constructive discharge, Defendant is entitled to summary judgment on those claims.  See Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (citing Douglas v. Victor Capital Grp, 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (collecting cases)); Nat'l Commc'ns Ass'n, Inc. v. American Tel. & Tel. Co., 92 Civ. 1735, 1998 WL 118174 at *28 (S.D.N.Y. March 16, 1998) (where plaintiff did not address claim in response to defendant's summary judgment motion, claim deemed "abandoned" and defendant granted summary judgment); Anti–Monopoly, Inc., v. Hasbro, Inc., 958 F.Supp. 895, 907 & n. 11 (S.D.N.Y. 1997) ("the failure to provide argument on a point at issue constitutes abandonment of the issue"), aff'd, 130 F.3d 1101 (2d Cir. 1997); Ortho Pharm. Corp. v. Cosprophar, Inc., 828 F.Supp. 1114, 1129 (S.D.N.Y. 1993) (claim dismissed where plaintiff "appears to have abandoned this claim, having failed to argue the claim in its post-trial memo or in its response papers once [defendant] had addressed the issues in its own brief"), aff'd, 32 F.3d 690 (2d Cir. 1994).

A.    **LEGAL STANDARDS**

1.    **Summary Judgment**

Summary judgment is warranted where the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks omitted).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

"Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the

discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").  Instead, the plaintiff must offer "concrete particulars." Bickerstaff v. Vassar Coll., 196 F.3d 435, 451-52 (2d Cir. 1999) (disregarding plaintiff's Rule 56(e) affidavit because it lacked "concrete particulars"); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

### 2. Disability Discrimination Under the ADA

Section 102(a) of the ADA creates a private right of action for disability-based employment discrimination.  See 42 U.S.C. § 12112.  Claims of disability discrimination under the ADA are governed by the three-step burden shifting framework set out in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973).  Under McDonnell Douglas, a plaintiff must first establish a prima facie case of unlawful discrimination.  If the plaintiff meets this burden, the defendant must rebut the prima facie case of discrimination by producing a legitimate, non-discriminatory reason for the allegedly discriminatory action.  The plaintiff then bears the ultimate burden of proving that the defendant's stated justification for termination was merely pretext and the real reason for the termination was discrimination.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-56 (1981).

Plaintiff first argues that she could perform her job with reasonable accommodation, but the Hospital failed to accommodate her.  Second, Plaintiff alleges that she was discharged from her position because of her disability.

13

### a.     __Failure to Accommodate__

A prima facie case for a failure to accommodate claim "'requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'"  Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 183-84 (2d Cir. 2006) (quoting Rodal v. Anesthesia Gp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)). "Employees are not entitled to hold out for the most beneficial accommodation, and [an] employer need not offer the accommodation that the employee prefers.  Instead, when any reasonable accommodation is provided, the statutory inquiry ends."  Waltzer v. Triumph Apparel Corp., No. 09 Civ. 288, 2010 WL 565428, at *6 (S.D.N.Y. Feb. 18, 2010) (internal citations and quotation marks omitted).  Additionally, "summary judgment may be granted where the proposed accommodation would omit an essential function of the job."  Canales-Jacobs v. N.Y. State Office of Court Admin., 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009).

### b.     __Discriminatory Termination__

In order to establish a prima facie case of discrimination under the ADA, the plaintiff must establish that:  (1) the defendant is subject to the ADA; (2) plaintiff suffers from a qualifying disability; (3) plaintiff was otherwise qualified to perform the essential functions of her position with or without a reasonable accommodation; and (4) the defendant terminated plaintiff's employment under circumstances giving rise to a reasonable inference of discrimination because of her disability.  See Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003).  Where the plaintiff was not actually fired, she may establish constructive discharge if she can show that her employer made her working conditions "'so difficult or

unpleasant that a reasonable person in the [plaintiff's position] would have felt compelled to resign.'" Terry v. Ashcroft, 336 F.3d 128, 152 (2d Cir. 2003) (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)).

**B.     ANALYSIS**

**1.     ADA Claims**

In order to make out a prima facie case under either ADA theory, Plaintiff must show that she is disabled within the statutory meaning of the ADA.  Because Plaintiff cannot satisfy this burden, she cannot establish a prima facie case on either her failure to accommodate or her discriminatory termination claim.  Furthermore, Plaintiff has not demonstrated that she was wrongfully terminated.

**a.     Plaintiff is Not "Disabled" Within the Meaning of the ADA**

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities . . . ."  42 U.S.C. § 12102(1)(A).  EEOC regulations – to which the Court "accord[s] great deference," because the EEOC "is charged with administering the statute," Francis v. City of Meriden, 129 F.3d 281, 283 n.1 (2d Cir. 1997) – define a "physical or mental impairment," as follows:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

An impairment "substantially limits" major life activities when the disabled person is "unable to perform a major life activity that the average person in the general population can perform" or is "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared . . . to an average person."  29 C.F.R. § 1630.2(j)(1).  "Factors to consider in determining whether a major life activity is substantially limited include:  the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact."  Capobianco v. City of N.Y., 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)).  "'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree,' and thus clearly precludes impairments that interfere in only a minor way. . . ."  Toyota Motor Mfg., K.Y., Inc. v. Williams, 534 U.S. 184, 196 (2002).

Defendant concedes that Plaintiff's condition is an impairment, but argues that she is not disabled under the ADA, because her dystonia[8] has not substantially limited her performance in the major life activity at issue – working.  (See McDonald v. City of New York, 2011 WL 1331504 (E.D.N.Y. 2011) ("Having determined that plaintiff has established the existence of an impairment, the question remains whether the impairment 'substantially limits,' rather than merely affects, these identified life activities which are deemed to be "major" under the ADA.")

Where an ADA claim is founded – as here – on an assertion that the plaintiff's disability has substantially limited her in the major life activity of working, "[t]he term

---

[8]   Although there is no question that Plaintiff suffers from dystonia, "it is well settled under federal law that the ADA requires more than a diagnosis of a condition for a person to be considered disabled as that term is defined under the Act."  See Toyota, 534 U.S. at 198 (2002) ("[i]t is insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of impairment").

substantially limits means significantly restricted in the ability to perform either a class of jobs or

a broad range of jobs in various classes as compared to the average person having comparable

training, skills and abilities."[9]  29 C.F.R. § 1630.2(j)(3)(i).  Thus, "[a]n impairment that

disqualifies a person from only a narrow range of jobs is not considered a substantially limiting

one[,]" Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 723 (2d Cir. 1994), and "'[t]he inability to

perform a single, particular job does not constitute a substantial limitation in the major life

activity of working.'"  Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 383-84 (2d Cir.

1996) (quoting 29 U.S.C. § 1630.2(j)(3)(i)).

       Viewing the evidence in the light most favorable to Plaintiff, there is no genuine

issue of material fact as to whether dystonia has substantially limited Plaintiff in her ability to

engage in the major life activity of working.  After Plaintiff underwent the DBS procedure in

December 2004, she was authorized to return to work in March 2005.  The only limitation

imposed by her doctor was that she "work in the ICU setting and avoid any floor work including

step-down units."  (Toper Aff., Ex. 8)  Three subsequent letters from Dr. Kaplitt and a nurse

practitioner – issued between December 2005 and October 2007 – confirm that Plaintiff's

condition does not preclude her from fulfilling her duties as an ICU nurse.  (Id. Ex. 11 ("Ms.

Rebecca Serdans is cleared to return to work on 1/13/06."), Ex. 12 (repeating that Plaintiff

should be assigned to "work in the ICU setting"), Ex. 19 (expressing view that Plaintiff "would

do better  . . . remaining in the CTICU"))  The only limitation imposed by Dr. Kaplitt and Nurse

---

[9]  There is limited evidence in the record that Plaintiff's dystonia condition affects her walking,
sleeping, and eating.  See Pltf. Ex. C.  While these are considered "major life activities" within
the meaning of the ADA, see 29 C.F.R. § 1630.2(i), Plaintiff has not demonstrated that she is
"substantially impaired" with regard to these functions, nor has she suggested that the
impairment of these functions contributes to her being "substantially impaired" in her ability to
work.  See DiCara v. Connecticut Rivers Council, 663 F.Supp.2d 85, 91 n.1 (D. Conn. 2009)
Because the clear thrust of the Complaint is that Plaintiff is limited in the life activity of working,
that is the focus of the Court's analysis.

Practitioner Strybing is that Plaintiff not work near MRI machines.  (Id.)  Most of the Hospital's

intensive care units, including the CTICU, SICU, MICU, and CCU do not have MRI machines,

however.  (Def. R. 56.1 Stmt. ¶ 35)

Plaintiff herself acknowledged in an August 3, 2007 email to the Hospital's

director of employee relations that she "was evaluated and cleared to work in ICU areas except

for Neuro, which has an MR[I] on its premises. . . ."  (Id. Ex. 18)  Moreover, in her opposition

brief, Plaintiff asserts that she "could perform the essential functions of [her] position with or

without a reasonable accommodation, as she had been working for Defendant[] as an ICU nurse

for 10 years in all of the ICU locations."  (Pltf. Opp. Br. 9-10)  In short, there is no material issue

of fact as to whether Plaintiff is capable of working as an ICU nurse.  Indeed, it is undisputed

that Plaintiff performed her duties as an ICU nurse at the Hospital from 1998 through December

2007 and was hired as an ICU nurse at another hospital immediately thereafter.

Notwithstanding her ability to perform the duties of an ICU nurse, Plaintiff argues

that she cannot be exposed to MRI machines and EMI in general without suffering harm, and

that these circumstances constitute a "substantial limitation on the major life activity of

working."

In considering whether a medical condition substantially limits the major life

activity of working under the ADA, courts consider whether the plaintiff "is unable to perform

the variety of tasks central to most people's daily lives, not whether the [plaintiff] is unable to

perform the tasks associated with her specific job."  Toyota, 534 U.S. at 200-01.  Additionally, as

noted above, "[a]n impairment that disqualifies a person from only a narrow range of jobs is not

considered a substantially limiting one[,]" Heilweil, 32 F.3d at 723, and "[t]he inability to

perform a single, particular job does not constitute a substantial limitation in the major life

activity of working." Wernick, 91 F.3d at 383-84 (quoting 29 U.S.C. § 1630.2(j)(3)(i)).

Accordingly, the ADA does not recognize a substantial limitation on a person's ability to work

where that person is generally capable of working, but does not wish to work in a particular

location. See Kealy v. Consol. Edison Co. of N.Y., No. 98-cv-2210, 2002 WL 1552027, at *5

(S.D.N.Y. July 15, 2002) (finding no substantial limitation where plaintiff "was able to work at a

broad class of jobs including clerical positions, even though he was unable to work in the

particular location that he had worked in before his alleged impairment").

        Here, Plaintiff is not alleging that dystonia prevents her from working as an ICU

nurse.  Instead, she contends that her condition prevents her from working in certain ICUs at the

Hospital.  However, the record indicates that she is capable of performing the variety of tasks

central to most people's daily lives, including – according to her physician – even "work in such

a physically and emotionally demanding environment as the CTICU night shift."  (Toper Aff.

Ex. 19)

        While this Court is sympathetic to Plaintiff's condition, and recognizes that she

suffers from a serious and incurable disease, her dystonia has not been shown to substantially

impair her ability to engage in the major life activity of working.  Plaintiff's impairment falls

outside the ADA's protection because, while dystonia unquestionably affects her daily life, she

can (and has) performed all of the duties expected of her at the Hospital.  Cf. Price v. Mount

Sinai Hosp., No. 07-cv-11318, 2010 WL 4910218, at *8 (S.D.N.Y. Nov. 23, 2010) (finding no

substantial limitation where, despite plaintiff's presentation of evidence that sleep disorder

interfered with her everyday life, she could continue to perform major life functions).  Because

Plaintiff does not suffer from a disability within the meaning of the ADA, Defendant is entitled to summary judgment on Plaintiff's ADA claims.[10]

### b.   <u>Discriminatory Termination</u>

Even if Plaintiff could establish that she is disabled for purposes of the ADA, her claim for discriminatory termination would fail.  In order to prevail on such a claim, Plaintiff must demonstrate, <u>inter alia</u>, that Defendant terminated her employment under circumstances giving rise to a reasonable inference of discrimination because of her disability.  <u>See</u> <u>Shannon</u>, 332 F.3d at 99.  Where a plaintiff is not actually fired, she may establish constructive discharge by showing that her employer made her working conditions "'so difficult or unpleasant that a reasonable person in the [plaintiff's position] would have felt compelled to resign.'"  <u>Terry v. Ashcroft</u>, 336 F.3d 128, 152 (2d Cir. 2003) (quoting <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 89 (2d Cir. 1996)).

Here, there is no evidence that Plaintiff was ever formally terminated.  Moreover, when asked at her deposition whether the Hospital ever terminated her employment, Plaintiff

---

[10] Plaintiff does not contend that Defendant regarded her as disabled in violation of 42 U.S.C. § 12102(1)(C).  Even if she advanced such a claim, it would fail.  "To prevail under the 'regarded as' provision of the ADA, a plaintiff must show more than 'that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.'"  <u>Jacques v. DiMarzio</u>, 386 F.3d 192, 201 (2d Cir. 2004) (quoting <u>Colwell v. Suffolk Cnty. Police Dep't</u>, 158 F.3d 635, 646 (2d Cir. 1998)).  A "regarded as claim turns on the employer's perception of the employee and is therefore a question of intent, not whether the employee has a disability."  <u>Copobianco v. City of N.Y.</u>, 422 F.3d 47, 57 (2d Cir. 2005) (citations and internal quotation marks omitted).  Here, Defendant offered Plaintiff work in its ICUs throughout the period between 1998 and December 2007.  There is no evidence that Defendant perceived Plaintiff as disabled.  Although Defendant – at Plaintiff's request – agreed to only offer Plaintiff work in the CTICU, this action does not constitute an admission that Defendant regards Plaintiff as disabled under the ADA.  <u>Cf.</u> <u>Kramer v. Hickey-Freeman, Inc.</u>, 142 F. Supp. 2d 555, 560 (S.D.N.Y. 2001) (rejecting argument that defendant's willingness to grant plaintiff a medical leave of absence proves that defendant regarded plaintiff as disabled under the ADA).  Therefore, any attempt to advance a "regarded as" claim would fail.

answered "No." (Pltf. Dep. 18) In opposing Defendant's motion to strike, Plaintiff's counsel

explains that Plaintiff's theory is not termination but constructive discharge. (Pltf. Opp. Strike

Br. 3-4)

       In its memorandum of law in support of its summary judgment motion, Defendant

argues at length that "Plaintiff has not established a claim of constructive discharge." (Def. Sum.

J. Br. 16-18) In her opposition brief, Plaintiff does not respond to Defendant's arguments. As

discussed above, under these circumstances, Plaintiff has abandoned any constructive discharge

claim. Taylor, 269 F. Supp.2d at 75; Douglas, 21 F. Supp.2d at 393; National Commc'ns Ass'n,

Inc., 1998 WL 118174, at *28; Anti–Monopoly, Inc., 958 F.Supp. at 907 & n. 11; Ortho Pharm.

Corp., 828 F.Supp. at 1129. Accordingly, even if Plaintiff had made out a prima facie case of

disability, Defendant would be entitled to summary judgment on her ADA claim to the extent

that it is based on a discriminatory termination or constructive discharge theory.

      **2.**     **State Law Claims**

       "Disability" is defined more broadly under the New York State and City laws

than under the ADA, because the NYSHRL and NYCHRL "do not require the employee to

demonstrate that a physical or mental impairment substantially impairs a major life activity."

Agostinello v. Great Neck Union Free Sch. Dist., 2009 WL 238865, at *16; Giordano v. City of

New York, 274 F.3d 740,754 (2d Cir. 2001) ("the New York Court of Appeals, whose

construction of New York State law binds this Court, has confirmed that the definition of a

disability under New York law is not coterminous with the ADA definition" (internal citations

omitted))

       Having determined that Defendant is entitled to summary judgment on Plaintiff's

sole federal cause of action – disability discrimination under the ADA – the Court will not

exercise supplemental jurisdiction over Plaintiff's remaining state and city law claims of

disability discrimination and retaliation.[11] See 28 U.S.C. § 1367(c); Giordano, 274 F.3d 740,

753-54 (2d Cir. 2001) ( "in the absence of any remaining federal claims, the appropriate analytic

framework to be applied to discrimination claims based on a 'disability' as defined by New York

state and municipal law is a question best left to the courts of the State of New York"); United

Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are

dismissed before trial, . . . the state claims should be dismissed as well.")

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is

granted. Defendant's motion to strike is denied as moot. The Clerk of the Court is directed to

terminate the motions (Dkt. Nos. 17, 28), and to close this case.

Dated:      New York, New York
            September 23, 2011

SO ORDERED:

Paul G. Gardephe
United States District Judge

---

[11]  Plaintiff's brief opposing summary judgment discusses a purported claim for retaliation under
the ADA, but the Complaint pleads no such claim. The Complaint's retaliation claims are set
forth in the Second and Fifth Causes of Action, which rely on, respectively, New York State and
New York City law. (See Cmplt. ¶¶ 48-50, 57-59). Plaintiff's ADA claim – set forth in the
Complaint's Ninth Cause of Action – does not address retaliation and does not cite to 42 U.S.C.
§ 12203, the ADA's anti-retaliation provision. Although the Complaint's ad damnum clause
makes a passing reference to retaliation under the ADA – but not under the State and City Law –
this reference is not sufficient to plead a claim for retaliation under the ADA.